# 24-1236

IN THE

*United States Court of Appeals*

FOR THE SECOND CIRCUIT

VALENTIN KHAZIN *Plaintiff Appellant*

Lawrence Hawkins

*Plaintiff*

*v.*

THE CITY OF NEW YORK, SYLVESTER GE, JOHN
SANFORD, JOHN LIPKE, MARC LEVINE, STEPHEN
BRAITHWAITE, VINCENT GREANY, MICHAEL LAU,
MICHAEL DIAZ, and DANIEL BROWN

*Defendants Appellees*

On Appeal from the United States District Court
for the Eastern District of New York

## **APELLANT'S BRIEF**

Law Office of John A. Scola, PLLC
Attorneys for Petitioner- Appellant
Valentin Khazin
90 Broad Street, 10th Floor New
York, New York 10004
(917) 423-1445
jscola@johnscolalaw.com

New York City Law
Department
Attorney for Respondent -
Respondent
100 Church Street
New York, NY 10007

# TABLE OF AUTHORITIES

*Bart v. Telford*,
  677 F. 2d 622 (7th Cir. 1982)                                    19

*Benedith v. Malverne Union Free Sch. Dist.,*
  No. 11–CV–5964(ADS) (GRB), 38 F.Supp.3d 286, 322
  2014 WL 4056554, at *29 (E.D.N.Y. Aug. 15, 2014)                 20

*Beyer v. County of Nassau,*
  524 F. 3d 160, 163 (2d Cir. 2008)                                25

*Birch v. City of New York*,
  184 F. Supp. 3d 21 (E.D.N.Y. Cogan, J. May 3, 2016, 16-CV-34)    19

*Bowen-Hooks v. City of N.Y.,*
  13 F. Supp. 3d 179,221 (E.D.N.Y. 2014)                           37

*Bragg v. Navistar Int'l Transp. Corp*.,
  164 F. 3d 373,377 (7th Cir. 1998)                                36

*Brown v. Snow,*
  No. 02 Civ.7985, 2003 WL 1907974, at *3.(S.D.N.Y 2003)           25

*Burgos v. City of New York,*
  No. 18-CV-1150 (JPO), 2019 WL 1299461, at *8
  (S.D.N.Y. Mar. 21, 2019)                                         26

*Case of Burlington N. & S. F. R. Co. v. White*
  548 US 53 (2006)

*Campbell v. NYC. Transit Auth.,*
  93 F. Supp. 3d 148, 177 n.30 (E.D.N.Y. 2015)                     27

*Chertkova v. Connecticut Gen. Life Ins. Co.,*
  92 F.3d 81, 89 (2d Cir.1996);                                    36

*Crawford v Metropolitan*

Clifton Park Apts. LLC v. New York State Div. of Human Rights,     37
  2024 NY Slip Op 000793 (2024).

iii

555 U.S. at 277, 129 S.Ct. 846. (2009) 21

*Cruz v. Coach Stores, Inc.,*
 202 F.3d 560, 566 (2d Cir.2000). 19

*Delville v. Firmenich Inc.,*
 920 F. Supp. 2d 446, 466 (S.D.N.Y. 2013) 3 1

*Espinal v. Goord,*
 558 F.3d 119, 129 (2d Cir.2009). 29

*Ewing v. Coca-Cola Bottling Co. of New York,*
 No. 00 Civ. 7020, 2001 WL 767070, at *6 (S.D.N.Y. June 25 2001), 25

*Ezuma v. City of New York,*
 665 F. Supp. 2d 116 (E.D.N.Y. 2009) 19

*Galabya v. N.Y.C. Bd. of Educ.,*
 202 F.3d 636, 640 (2d Cir.2000)) 25

*Galdieri–Ambrosini v. Nat. Realty & Dev. Corp.,*
 136 F.3d 276, 292 (2d Cir.1998). 21

*Gordon v. N.Y.C. Bd. of Educ.,*
 232 F.3d 111, 116 (2d Cir.2000) 22, 23

*Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.,*
 252 F.3d 545, 554 (2d Cir.2001) 23

*Gorzynski v. JetBlue Airways Corp.,*
 596 F.3d 93, 110 (2d Cir.2010) 29

*Graham v. Long Island R.R.*
 230 F.3d 34(2nd Circ. 2000). 28

*Grana v.Potter,*
 Nos. 06-CV-1173, 07-CV-0476, 2009 WL 425913, at *7
 (E.D.N.Y. Feb. 19, 2009). 28

*Greene v. Brentwood Union Free Sch. Dist.,*
 966 F.Supp.2d 131, 156 (E.D.N.Y.2013) 33

*Henry v. Wyeth Pharm., Inc.,*
 616 F.3d 134, 145, 149 (2d Cir.2010) 22

*Joseph v. Leavitt,*
 465 F.3d 87, 91 (2d Cir.2006). 24

*Kaytor v. Elec. Boat Corp.,*

609 F.3d 537,552 (2d Cir. 2010)    30

*Kelly v. Howard 1 Shapiro & Assocs. Consulting Eng'rs, P.* C.,
    716 F.3d 10, 14 (2d Cir.2013)    18, 21

*Ki rsch v. Fleet Street, Ltd.,*
    148 F.3d 149, 161 (2d Cir.1998).    36

*Kwan v. Andalex Grp. LLC,*
    737 F.3d 834, 845 (2d Cir.2013).    22, 37

*Lewis v. N.Y.C. Transit Auth.,*
    12 F.Supp.3d 418, 439 (E.D.N.Y.2014)    25

*Little v. NBC,*
    210, F. Supp. 2d 330,384 (S.D.N.Y. 2002).    25

*Long v. Credit Suisse*,
    1995 WL 498783 (S.D.N.Y. 1195)    33

*Lopez v. S.B. Thomas, Inc*.,
    831 F. 2d 118 (2d Cir. 1987).    36

*McDonald-Douglas Corp. v. Green,*
    411 U.S. 792, 802 (1973).    18

*Mihalik v. Credit Agricole Cheuvrex North Am., Inc*.,
    715 F. 3d 102, 110 (2d Cir. 2013).    37

*Minetos v. City Univ. of N.Y.,*
    875 F.Supp. 1046, 1052 (S.D.N.Y.1995)    36

*Monclova v. City of New York,*
    No. 05-CV-3164, 2008 WL 822117, at *7 (E.D.N.Y. Mar. 26, 2008)    27

*Nat'l R.R. Pass.Corp. v. Morgan*,
    536 U.S. 101 (2002).    19

*Nieblas-Love v. NYCHA,*
    165 F. Supp 3d. 51 (S.D.N.Y. 2016)    18

*Olaechea v. City of New York ,*
    2019 WL 4805846 (S.D.N.Y. September 30, 2019)    24, 27, 31

*Pena v. Brattleboro Retreat,*
    702 F.2d 322, 325 (2d Cir.1983).    36

*Rivera v. Rochester Genesee Reg'l Transp. Auth.,*

    26
    743 F.3d 11, 25 (2d Cir. 2012)

*Rosario v. N Y.C. Dep't of Homeless Servs.,*

    No. 06 Civ. 7197 (PAC) (GWG), 2008 WL 449675, at *6

        (S.D.N.Y. Feb. 19, 2008)         28

*Summa v. Hofstra Univ.,*

    708 F.3d 115, 125 (2d Cir. 2013)       18,23, 29,

*Taylor v. Brentwood Union Free Sch. Dist.,*

    143 F.3d 679, 684 (2nd Circ. 1998)       28

*Treglia v. Town of Manlius,*

    313 F. 3d 713, 720 (2d Cir. 2002).       26

*Univ. of Tex. Sw. Med Ctr. v. Nassar,*

    570 U.S. 338, 348-49 (2013).       18

*Vega v. Hempstead Union Free Sch. Dist.,*

    801 F.3d 72, 90 (2d Cir. 2015).       26

*Villavicencio v. Gure-Perez,*

    56 F.Supp. 3d 178, 125 Fair. Empl. Prac. Cas.

    416 (E.D.N.Y. 2014 ).       31, 32,

*Whidbee v. Garzarelli Food Specialties, Inc.,*

    223 F.3d 62, 73 [2d Cir2000] )       35

*White v. Dep't of Corr. Servs.,*

    814 F. Supp. 2d 374, 388-389 (S.D.N.Y. Sept. 30, 2011).   26, 27

*Zann Kwan v. Anda/ex Grp. LLC,*

    737 F.3d 834, 847 (2d Cir. 2013)       22, 37

**Statute**         **Page**

New York City Administrative Code §§8-107 et seq.     37

New York State Human Rights Law, N.Y. Exec. Law§§ 290-97    37

Title VII of the Civil Rights Act of 1964, as amended,

    42 U.S.C. §§ 2000e et seq       18, 25, 26, 31, 34, 36

`

## PRELIMINARY STATEMENT

The District Court erred in granting summary judgment to the Defendants in this case. Plaintiff Valentin Khazin, a former New York City Police Department ("NYPD") Sergeant, was rail-roaded out of the NYPD after he refused to target a black subordinate police officer based on his race. When Plaintiff refused to discriminate his career was systematically ended. The District Court chose to overlook numerous affidavits of co-workers of Plaintiff and his rebuttal of the discipline levied his way in order to credit the Defendants explanations and award them judgment herein. The facts remains that Plaintiff sufficiently rebutted the legitimate business reasons offered by the Defendants. At the very least, the Court failed to perform the analysis required for Plaintiff's New York State and City Human Rights claims. Plaintiff submits an affidavit which states that Plaintiff was being retaliated against for not discriminating against Harge. Plaintiff testifies that he engaged in protected activity for not discriminating against Harge. As a result, the Court's decision was in error and should be reversed in its entirety and the case remanded back to the Eastern District of New York for trial.

## STATEMENT OF FACTS

Plaintiff highlights several facts which are of particular importance to his opposition. For a complete record of facts, the Court is respectfully referred to Defendants' Reply Statement of Material Facts Pursuant to Local Civil Rule 56.1 for a statement of pertinent and material facts. These facts can be found in Appendix A0763.

Plaintiff was chosen for Highway District, one of the most selective units in the NYPD, in May 2015 based on his stellar job performance as a Sergeant in the 70th Precinct. (See 56.1 at 1, 2 (A0763) and 155-166) (A00799). Plaintiff's Commanding Officer ( "CO")in the 70th Precinct highly recommended Plaintiff for Highway stating in his recommendation that Plaintiff "sets high standards for police performance and encourages subordinates to extend themselves in serving the community" and "is of high integrity and not a discipline problem." (Id at 164-166) (A0800). Prior to joining Highway Plaintiff submitted applications for off duty employment. Id at 170 (A0801). [1]Plaintiff believed these applications were approved. Id at 171. Upon arriving in Highway, Plaintiff was tasked with supervising Police Officer Dana Harge. Id at 6 (A0764). Shortly after arriving to Highway on May 4, 2015, Plaintiff was informed by Harge that he had filed a complaint of discrimination on May 18, 2015 against Defendant Jonathan Lipke . Id at 172. Following a discrimination complaint, the Integrity Control Officer ("ICO") in the Command is informed by the Office of Equal Employment ("OEEO") of the complaint. See Exhibit 2 at 36:10-37:10 (A00585). Lipke testified the ICO would then inform the CO of the complaint. Id Plaintiff reported to Defendant Levine. See 56.1 at 5. (A00764). Plaintiff was approached by Lt

---

[1] There is a dispute over when these applications were submitted. Defendants in their Reply to Plaintiff's Counter Statement of Facts states at 170 states that the off-duty applications were submitted in 2014. Plaintiff's position is that Plaintiff submitted applications immediately before transferring to Highway and these applications went missing. Id at 170-173

Levine on June 24, 2015 and was told by Levine that Harge is a "liar" and "lazy." See 56.1 at 14 (A00766). Levine further informed Plaintiff that he could not approve lost time or days off for Harge and they had to be approved by Lipke, the person Harge filed a complaint against. See Id at 22(A00767). Following his complaint of discrimination, Harge was the only officer assigned a specific post each day. Id at 175 (A00802). Plaintiff viewed these requests to be unlawful retaliation. See Ex. 9 at 39:24 (A00616). Plaintiff states in an interview from December 19, 2016 that Levine told him to intentionally and openly discriminate against...Harge" and "when I did not, Lt Marc Levine, Lt. Jonathan Lipke and Deputy Inspector Ge did scrutinize my work and did create a hostile work environment subjecting me to harsh discipline and even transferring me under a civilizations program to the 9th Precinct." See Exhibit "8" and 56.1 at 11 (A0765). Plaintiff was not instructed to treat other officers similarly. Id at 21. (A00767) Plaintiff believed Harge was treated more harshly due to his complaint of discrimination. See Exhibit 12 at 22:13 (A0667). Defendants admit Plaintiff believed the treatment of PO Harge to be in retaliation for PO Harge's prior complaint of discrimination and because of PO Harge's race. Id at 186 (A0804). Plaintiff failed to follow the orders of Lt. Levine and granted Harge lost time and a day off in November 2015. Id at 43, 44, 45,46 and 184 (A0771 and A0804). Immediately following this failure to follow the orders of Levine, Plaintiff was yelled at for helping Harge. Id at 44 (A0771). Plaintiff immediately had his

tour changed, creating a hardship on Plaintiff's related to childcare arrangements on November 30, 2015. Id at 42, 43 (A0771). The proper punishment for failing to follow a lawful order would be an immediate suspension. Id at 44 (A0771), 224 (A0811) and Exhibit 20. Plaintiff however was not suspended pursuant to the Patrol Guide. See56.1 at 225 (A0811). Plaintiff testified that his tour was changed "after I issued Harge. They realized I was not going to deny Harge days off for opportunities or create extra work for him, so they begin disciplining me on subsequent minor violations and that surmounted of me being switched to the afternoon shift." See Exhibit 11 at 104:10. (A0636)

Following the tour change, Sergeant Maduros filed a complaint against Plaintiff for possibly working off duty employment while on job time. Id at 73. (A0777) The complaint by Madouros was found to be unsubstantiated. Id. Plaintiff was informed that through the course of his investigation that his previous applications for off duty employment were "missing." Id at 239. (A0814) Plaintiff, upon learning the paperwork was missing, immediately submitted new applications in Highway on January 30, 2016. Id. Sylvester Ge testified that this was the proper procedure for an officer who learned his previous applications went "missing." Id at 240. (A0814) Contrary to NYPD policy, Plaintiff's application was never approved nor denied and sat in limbo until his transfer out of Highway which was contrary to NYPD policy. Id at 243-

254. (A0814-A0815) Defendant Ge testified that Plaintiff's application was denied due to his "failure to supervise" determination which occurred in June 2016. Id at 250.(A0815) Lipke testifies that the papers were sent to Inspector Ameri and that they did not want them until the investigation was pending. See Exhibit "2" at 92:14 (A0593. Defendant Lipke testified that "during a pending investigation that an Officer would be afforded the same benefits as every other officer. Id at 253. (A0816) Nevertheless, Defendants claim that Plaintiff's application were held in abeyance without informing him due to pending investigations against him. Id at 247. (A0815)

Fellow Sergeant, and comparator, Robert Serra submitted his off-duty employment paperwork on February 1, 2016. Id at 241 (A0814). Sergeant Serra received an approval on the same day he submitted the application. Id at 242. (A0814) Since Plaintiff never received his applications back or was told otherwise, he believed that his off-duty applications had been approved. Id at 252.(A00816)

Even though the Madouros complaint was unsubstantiated, Lipke began investigating Plaintiff for other matters including off duty employment. Id at 76. (A00778) The investigation by Defendants Lipke and Ge were outside the scope of their respective job duties. Id at 55 (A0773), 73 (A0733), 208 (A0808) and 222 (A0811).. Plaintiff was determined by Lipke and Ge to

have worked unauthorized off duty employment, failed to supervise a parade detail, and violated department rules. Id at 76. Plaintiff contests the veracity of each of these findings. Id at 77-79. A00778 and 779). These findings contradict the testimony of Lipke who testified explicitly that he was aware that Plaintiff had previously submitted off-duty applications prior to coming to Highway. Id. Lipke was further aware that Plaintiff immediately submitted new applications after he was informed they were missing. Id at 239, 240. (A0814) Further, the Defendants determined that Plaintiff somehow failed to supervise police officers at a parade without even speaking to those officers. Id at 77-79. A00778 and 779). Lipke did not conduct a proper investigation into Plaintiff and failed to follow internal procedures, nor have the Defendants exchanged investigative worksheets detailing the substance of Lipke's investigation. Id. Lipke testified that these "worksheets" were forwarded to transportation investigation. See Exhibit "2" at 127:6. A00598. Plaintiff further contests the other allegations levied against him by the Defendants accusations of nitpick violations that other employees were not disciplined over. See at 77-79 (A00778 and 779). Plaintiff suffered additional harassment which was well known throughout the Command for failing to target Harge. See generally the Affidavit of Sgt Fritz Glemaud (A00870) and at 43 of Exhibit 4. A00875. As a result of these erroneous findings, Plaintiff was recommended to be transferred out

of Highway on March 31, 2016. Id at 75. Defendant Ge asked for the transfer to be expedited. Id at 256.A00816

While at Highway, contrary to the Defendants claims, Segreant Fritz Glemaud personally observed Plaintiff as a hard-working officer who was well liked and a great supervisor. See Exhibit 4 at 17. A00872. Inspector Ameri informed Sgt. Fritz Glemaud, prior to his death, that Plaintiff was a good cop with a hard work ethic. Id at 18. When Khazin failed to follow upper management's narrative towards Harge, he was retaliated against through the stripping of overtime, sitting on his applications for off duty, and unfair discipline. Id at 26-36. A00873. It was well known throughout Highway that upper management was targeting Plaintiff. Id at 43. A00875.

Plaintiff was forced out of Highway as a result of Lipke's investigation. See 56.1 at 75,

80. A0778-780. Plaintiff was told that if he accepted the penalty and transferred out of Highway that the matter would be closed, and he could move on with his career. Id at 79 A00780. As a result, Plaintiff received an administrative transfer (punitive transfer) out of Highway on June 6, 2016. Id at 89. A00783. The transfer was labeled internally as a civilization transfer. Id at 80. The Defendants masked this type of transfer to hide retaliation as if the transfer was labeled an administrative transfer Plaintiff would have recourse through his union by filing a grievance to challenge the transfer. See Exhibit 32 at 5.

A00879. When a CO does not have a good faith basis for transferring a member of service they would utilize a "civilization transfer" as a work around the need to justify the transfer. Id.

Plaintiff filed a formal complaint of discrimination on June 29, 2016 alleging amongst other things that Harge was being targeted due to his race and in retaliation for his complaint of discrimination and was being unfairly disciplined. See 56.1 at 23-25 (A0768). Following a discrimination complaint, the ICO in the Command is informed by OEEO of the complaint who informs the CO. See Exhibit 2 at 36:10-37:10 (A0585). Inspector Ge reviewed old records of Plaintiff and two other members of Highway who filed complaints of discrimination, Harge, and Andre Sce. See 56.1 at 199-202 (A0806). Following the Complaint, Ge was able to manufacture a complaint from June 2016 wherein Ge accused Plaintiff of failing to supervise Harge when he was off the highway prepping Harge for traffic court which occurred in June 2015. Id at 299 (A00823). Plaintiff vehemently denies that he was off post while prepping Harge. Id at 285-301. (A00821-824) During the time that Plaintiff was assisting Harge with traffic court preparation, a 10-10 job came over the radio. Id at 302 A00824. A 10-10 job is a minor call that is unverified. Id at 302-321. (A00824-827. A police officer would not even put his sirens on to respond to this job. Id at 310. (A00825) Harge ultimately responded to the job following

8

the meeting with Plaintiff and found it to be unsubstantiated. Id at 311, 312. (A00825) It is not uncommon for jobs over the radio to become backlogged. Id at 313. Plaintiff's supervising Lieutenant who failed to intervene on the call, was not disciplined for failing to supervise Plaintiff. Id at 315, 319 (A00826). If a call is important enough, a Lieutenant who will intervene and reassign the job if a sergeant is busy. Id at 311, 312 (A00825) and also Affidavits of Morton and Peter Miller at 32 and 33 respectively. See A00879 and A00883. Plaintiff, Officer Morton , and Peter Miller all will testify that from their own personal knowledge a 10-10 job is a low priority job that is not an emergency. Id, and see Exhibit 32 at 18-28 (A00879) and Exhibit 33 at 8-14. A00883

Following his transfer to the 9th Precinct, Lipke visited the 9th Precinct in September 2016. Id at 93. Lt. Olaechea immediately noticed that following this visit Khazin was treated in the same retaliatory manner as herself and others who had filed complaints of discrimination against upper management in the 9th precinct. See Exhibit 47 at 59. (A00866) Olaechea specifically requested that Plaintiff be transferred to the 4 x12 tour to work or her, as she viewed him as a hard worker, and was told by Sergeant Gaon that "a call came down from the CO of Highway and we cannot give Sergeant Khazin what he wants under any circumstance." Id at 61, 62. (A00774) The night differential pay for the 4 x 12 tour is $4,000. See Exhibit 38 at 265:23. A00786.

On October 5, 2016 Plaintiff was served a command discipline for the alleged infractions which occurred in Highway. See Exhibit CC (A00413). The Command Discipline was dated August 22, 2016, less than two months from Plaintiff's Complaint. Plaintiff was docked 10 days pay for these manufactured allegations which he vehemently denies any wrongdoing. See 56.1. at 283. (A00821) A week later, Plaintiff was served with charges and specifications related to the Martha's Bakery allegation on October 12, 2016. See Defendants EE (A00769). This was contrary to policy as the Defendants jumped straight to Charges and Specifications. See 56.1 at 34. (A00769) Plaintiff vehemently disputes the findings of this disciplinary charges. Id at 301-321. (A00824-827).

Plaintiff filed a second complaint of retaliation and discrimination on November 1, 2016. Id at 92. (A0783). Following a discrimination complaint, the ICO in the Command is informed by OEEO of the complaint who informs the CO. See Exhibit 2 at 36:10-37:10. (A0585). Within a week of his complaint of retaliation, on November 7, 2016, Plaintiff was placed on performance monitoring. See 56.1 at 99. (A0765). Plaintiff was placed on performance monitoring, allegedly for having too many open investigations. Id at 99. (A0765). Defendant Lipke testified that "during a pending investigation that an officer would be afforded the same benefits as every other officer. Id at 253.. (A0816).The NYPD Performance Monitoring guide does not list pending

investigations as a basis for placing an employee on performance monitoring. Id at 364. (A0834) In fact, the CO is responsible for placing Plaintiff on monitoring which conflicts with the Defendants claims as to why Plaintiff was placed on monitoring. Id at 364-374. A00834- A00836).

Defendant Greaney claims that as a result of Plaintiff being placed on performance monitoring he was transferred to the day tours to be more closely monitored. Id at 101. (A0785). This contradicts the testimony of Defendant Brown who claims that Plaintiff was transferred to the day tours to fill a vacancy. Id. In fact, members on performance monitoring were not all assigned to the day tours, contrary to Greaney's claim. Id. This transfer to the day tour within three (3) weeks of his protected activity and cost Plaintiff $4,000 in night differential pay. Id. Despite being transferred to the day tour to be more "closely supervised" Plaintiff was assigned the most details of anyone in the command which required him to be out of the precinct and not supervised at all. Id at 95. (A0784). Plaintiff was also denied trainings following his complaint. Id at 90. (A0783). In reality, Plaintiff was transferred to the day tours following a meeting in the 9th Precinct between Lipke and Greaney. Id at 450. (A0846).

Further, Plaintiff's overtime plummeted in the 9th Precinct. Id at 106. In fact, Plaintiff overtime plummeted the most of anyone in the 9th Precinct. Id at 379, 380. (A00837) Plaintiff was similarly situated to several sergeants in the 9th

Precinct that earned more money than Plaintiff who had less seniority than Plaintiff. Id at 409-418. (A0843-844). In fact, Plaintiff earned $70,000 less money in the 9th precinct compared to similarly situated Sergeants from 2016 through the end of 2018. Id at 416 (A0843). The stripping of overtime is a common retaliatory tactic within the NYPD. See Exhibit 4 at 31 (A0873). Plaintiff also applied for the lucrative Highway Safety and Field Training Sergeant positions in the 9th Precinct. Id at 455 (A0849). Plaintiff applied twice for the Highway Safety position. Id at 456. (A0849). Plaintiff applied one time on February 18, 2017. See Exhibit 48. These positions were given to less senior sergeants. Id at 456 (A0849) and Exhibit 49. Plaintiff filed a subsequent complaint of retaliation on February 24, 2017. See A0788). Plaintiff in this complaint claimed that he was not being paid his overtime in a timely manner unlike everyone else in the command due to retaliation of Michael Diaz. See 56.1 at 385. (A0838). This allegation was determined to be unsubstantiated without even interviewing Diaz. Id at 387 (A0839). The NYPD determined, without speaking with Diaz, that he did not intentionally withhold overtime. Id at 388. (A0839). While the allegation of Plaintiff not being paid on time was unsubstantiated, it was determined that he had not been paid in a timely manner and was reimbursed the money he was owed. Id at 391. (A0839).

Plaintiff was harassed in the 9th Precinct in other ways which was witnessed by Police Office Thomas Morton. Id at 448 (A0848). Plaintiff was treated differently than other sergeants and was regularly harassed. Id at 448, 449 (A0848). Officer Morton witnessed Plaintiff constantly being recalled to the Command, had his overtime cut, and have his childcare accommodation overridden, denied days off. Id at 449-453 (A0848), See also Exhibit 32 at 7-17 (A0880-A0881). This retaliation is identical to the treatment of Police Officer Javier Velazquez who was retaliated against for filing a complaint of discrimination. See A0855. Both Velazquez and Olaechea filed complaints of discrimination and retaliation against the Defendants herein from the 9th precinct. Id. Following his complaint, Plaintiff was no longer permitted to attend meetings with the CO. Id at 96. A0784. Plaintiff appealed his 2016 performance evaluation which covered the period of January 2016 through December 2017 claiming the score of 3.0 was biased. Id at 127 (A0792). Defendant Greaney after hearing Plaintiff appeal based on a biased score, increased the score to 3.5, thus admitting the evaluation score had not been accurate of Plaintiffs true performance. Id at 127, 128, 419-424. (A0792 andA0843)

Unknown to Plaintiff, he was still being investigated for working off duty employment after being assigned to the 9th Precinct. Id at 460 (A0850).

Plaintiff had believed his off-duty employment had been approved. See 56.1 at 171 (A0802). Lipke testified that he did not recall whether Plaintiff was informed that his applications were in limbo contrary to NYPD policy. See Exhibit 2 at 92:21 (A0593). In an internal disciplinary hearing on September 27, 2017, Defendant Greaney was ordered to approve Plaintiff's off duty application for American Airlines. See 56.1 at 430 (A0845). Defendant Greaney promptly approved Plaintiff's off duty application. Id at 430. The sitting on Plaintiff's applications, contrary to NYPD procedure, is evidence of retaliation. From this point forward Plaintiff had permission to work off duty employment. Id at 435 (A0846). Officer Morton continued to witness Plaintiff constantly being recalled to the Command, had his overtime cut, and have his childcare accommodation overridden,. Id at 449-453, (A00848) and Exhibit 32 at 7-17 (A0880-A0881).

On October 11, 2018, Plaintiff was accused of several infractions related to off duty employment and submitting an anonymous complaint. Id at 135-140. (A0793). Plaintiff admits that he worked three shifts which he was on sick report. Id at 140. (A0795). The punishment for leaving your home while on sick report is a deduction of 10 days' pay and at most 20 days' pay for aggravated circumstances. See NYPD Disciplinary Matrix. Plaintiff vehemently denies the other allegations. See 56.1 at 171 (A0802). Following that interview Plaintiff was suspended for thirty (30) days for allegedly

making misleading or false statements in the GO-15. Id at 141(A0795). The Defendants failed to identify any statement that were misleading or false. Id. (A0795)

Lt Olaechea had never heard of anyone being denied off duty employment previously. See Exhibit 47 at Para 65. A0869. Further, Fritz Glemaud will testify that sitting on officers' application for off duty employment is a common retaliatory tactic. See Exhibit 4 at 28-32. (A0873)Plaintiff was issued formal charges on December 11, 2018. Id at 144. A0799. These charges and specification are pretextual for retaliation as several of the charges occurred after Defendant Greaney approved Plaintiff's off duty employment in September 2017. See Id at 143 (A0795) and 430 (A0845). Many of the allegations were covered by this approval. Id at 143. Plaintiff as a result of these charges was transferred to Bronx Viper. This transfer created a four-to- six-hour commute for Plaintiff known as "Highway Therapy." Id at 469. . (A0851) Plaintiff was explicitly told to enjoy "Highway Therapy" when he was reassigned. Id at 470. . (A0851)

The NYPD in the course of their investigation issued subpoenas citing the Patriot Act as the basis for obtaining records into Plaintiff. Id at 461-464 (A0850). This investigation spanned over four (4) years. Id at 461. (A0850) Despite this massive effort to investigate Plaintiff, the maximum penalty per the Disciplinary Matrix for working off duty without

permission is 15 days. See Exhibit 45 at Page 47 (A0782). The suggested penalty for being out of your home while on sick report is 10 days. Id at 88 (A0782). Plaintiff resigned from the NYPD on March 15, 2019. Id at 151 (A0798). Plaintiff resigned due to the unbearable conditions surrounding his commute, the constant tour changes, constant scrutiny, and bogus command disciplines. See Exhibit 25 at 13:14- 14:25 (A0713). Plaintiff also resigned due to the effects of the retaliation on his life, stress, and the heavy financial burden it caused. Id at 16:9 and 56.1 at 475-487 (A0853-853)**.** Plaintiff was served with charges and specifications on March 27, 2019. Id at 126. Plaintiff denies the allegations contained in these charges. Id at 447. (A0848) Plaintiff prophetically testified that once an officer files a complaint of retaliation, in the City of New York, and especially with the New York City Police Department is a death sentence. If you file that, regardless of rank, position, or anything, you will be retaliated against until the day you retire, quit, or get fired. See Exhibit 12 at 41:18. (A0683)

Lipke in October 2017 was issued his own set of charges and specifications claiming that 1) from April 1, 2016 until March 31, 2017, Lipke improperly and repeatedly used a department computer to access internet websites unrelated to his duties, 2) from April 1, 2016 until March 31, 2017 wrongfully conducted personal business during his scheduled tour, 3) On April 11, 2017 used department equipment for a non-department

purpose, 4) from April 1, 2016 until March 31, 2017 used his smart phone for a non-Department purpose and 5) On April 11, 2017 failed to carry out his duties as an ICO. See (A0855). Lipke pled guilty to these charges. See Exhibit 28. As a result of his guilty plea, Lipke was transferred out of Highway on December 6, 2017. See 56.1 at 491. (A0855). Unlike Plaintiff, the following day, Lipke was transferred back to Highway where he remains to date. Id. (A0855).

Plaintiff submitted four (4) witness affidavits which detail the retaliatory treatment he was forced to endure. Lieutenant Olaechea details that Plaintiff suffered the exact same form of retaliation as her and another police officer who filed complaints of discrimination. See Affidavit at A0857). Further, Plaintiff submits the affidavit of retired sergeant Fritz Glemaud. See A0869). Gleamaud's affidavit details the retaliatory intent of the Defendants herein. Specifically Gleamaud details that Plaintiff is being targeted for his refusal to target officer Dana Harge. Id at A0872) and the retaliatory actions that came from Plaintiff's refusal to target the black officer. Id at A0871- A0876. Plaintiff also submits the affidavit of Police Officer Thomas Morton which also details the retaliatory actions and disparate treatment towards Plaintiff. See A0878- A0882. Officer Morton details that the alleged infraction which led to Plaintiff's ouster from the NYPD's Highway Unit was retaliatory and manufactured to punish Plaintiff. Id. The affidavit of Peter Miller details the same. Id at A0883- A0885.

## STANDARD OF REVIEW

Retaliation claims brought under Title VII are governed by the framework set forth in *McDonald-Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *See Summa v. Hofstra Univ.,* 708 F.3d 115, 125 (2d Cir. 2013). Pursuant to that framework, in order to establish a *prima facie* case of retaliation in response to a motion for summary judgment, a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find that: "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Kelly v. Howard 1 Shapiro & Assocs. Consulting Eng'rs, P. C.,* 716 F.3d 10, 14 (2d Cir.2013) (per curiam). "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa,* 708 F.3d at 125. If the employer can do so, then the burden shifts back to the plaintiff to show that retaliation was a "but-for" cause of the adverse action, not simply a "substantial" or "motivating" factor in the employer's decision. *Univ. of Tex. Sw. Med Ctr. v. Nassar,* 570 U.S. 338, 348-49 (2013). "'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action-it is enough that the adverse action would not have occurred in the absence of the retaliatory motive." *Nieblas-Love v. NYCHA*, 165 F. Supp 3d. 51 (S.D.N.Y. 2016).

Although a retaliation claim cannot be based on a trivial slight, like refusing to allow an employee to bring a birthday cake to work, see *Bart v. Telford*, 677 F. 2d 622 (7th Cir. 1982), it is clear that retaliation cases can be based on a broader spectrum of conduct than discrimination claims. See *Zelnik v. Fashion Institute of Tech*., 464 F. 3d 217, at 226 (2d Cir. 2006); and *Nat'l R.R. Pass.Corp. v. Morgan*, 536 U.S. 101 (2002). In retaliation cases, all that is required to maintain the claim is to show action that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights*.." Zelnik v. Fashion Institute of Tech*., 464 F. 3d 217, 225 (2d Cir. 2006). That can certainly consist of a negative performance review, performance monitoring, or a within-grade transfer. See *Zelnik*, at 226*; Ezuma v. City of New York*, 665 F. Supp. 2d 116 (E.D.N.Y. 2009); *Birch v. City of New York*, 184 F. Supp. 3d 21 (E.D.N.Y. Cogan, J. May 3, 2016, 16- CV-34).

**ARGUMENT**
**POINT I**
**PLAINTIFF HAS SEVERAL VIABLE QUESTIONS OF FACT AS TO WHETHER HE WAS RETALIATED AGAINST**

**A. Protected Activity**

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000). "While a protected activity generally involves the filing of a formal complaint of discrimination with an administrative agency, the [Court of

Appeals for the] Second Circuit has recognized that protected activity includes informal protests of discriminatory employment practices, including making complaints to management." *Benedith v. Malverne Union Free Sch. Dist.,* No. 11–CV–5964(ADS) (GRB), 38 F.Supp.3d 286, 322, 2014 WL 4056554, at *29 (E.D.N.Y. Aug. 15, 2014).

Here, Plaintiff engaged in protected activity when he refused the orders of Lt. Levine to unlawfully target Police Officer Harge in November 2015 when he approved the lost time and gave a day off to Harge. It was known throughout the Command that Harge had filed the complaint of discrimination. This is corroborated by the affidavit of Fritz Glemaud which states that Plaintiff was being targeted after he refused to discriminate against Harge. Within a month of that complaint, which Plaintiff was explicitly informed of by Harge, Lt Levine approached Plaintiff to call Harge a liar, lazy and ordered him to treat him differently than every other officer in Highway. Plaintiff believed these orders to be retaliatory and unlawful discrimination. The moment Plaintiff refused to carry out these orders he was engaging in protected activity. Plaintiff further engaged in protected activity in June 2016, November 2016, and February 2017 when he complained about retaliation and discrimination. The District Court conclusively, and in error, determined that Plaintiff did not engage in protected activity in 2015

despite his clear testimony to the contrary. This factual question is precisely the question that is fit for a jury to decide at trial.

## B. Employers Awareness

"[I]nformal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by federal law." *Id.* "[I]mplicit in the requirement that the employer [was] aware of the protected activity is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's opposition was directed at [prohibited] conduct." *Galdieri–Ambrosini v. Nat. Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998). "[P]articular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint." *Kelly,* 716 F.3d at 17.The Supreme Court recognizes that opposition can be manifested subtly and without uttering a firm "no":

> "Oppose" goes beyond "active, consistent" behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it…We would call it "opposition" if an employee took a stand against an employer's discriminatory practices **not by "instigating" action, but by standing pat, say, by refusing to follow a supervisor's order.** *Crawford v. Metropolitan,* 555 U.S. at 277, 129 S.Ct. 846 (2009)

The Court of Appeals for the Second Circuit has held that when "indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear ominous significance."

*Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir.1998); *see also Henry v. Wyeth Pharm., Inc.,* 616 F.3d 134, 145, 149 (2d Cir.2010).

Here Harge filed a complaint of discrimination in 2015. The Defendants were aware of the complaint because the ICO is informed by OEEO immediately when a discrimination complaint is filed as per the testimony of Lipke who then tells the CO. Shortly thereafter, Levine told Plaintiff that Harge was a "liar." There is no other statement in which Harge could have been accused of lying other than that complaint. Plaintiff then refuses to retaliate against Harge, a protected activity. After Khazin refused to retaliate against Harge, he was immediately retaliated against. This alone is enough to input a general knowledge to satisfy this prong and certainly enough for a reasonable juror to conclude the Defendants were aware of the complaint.. Levine further immediately ordered Plaintiff to deny Harge benefits. Plaintiff testified that this occurred because of Harge's discrimination complaint. *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir.2000) ("Neither [the Second Circuit] nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.") See *Zann Kwan v. Anda/ex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) (noting that "a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence ...

to defeat summary judgment"). Plaintiff approved a day off and lost time for Harge in November 2015.

Immediately following his decision to not follow the unlawful orders of Lt Levine to discriminate and retaliate against Harge, Plaintiff had his tour changed creating a childcare hardship. Again, this alone would be enough to deter an officer from engaging in protected activity. Plaintiff testifies that his tour was changed within a week of his granting of lost time and a day off to Harge and further after it was realized he would not go along with the harassment of Harge. The Second Circuit in *Gordon* set forth this "However, even without direct evidence of causation, "a plaintiff can indirectly establish a causal connection to support a ... retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.,* 252 F.3d 545, 554 (2d Cir.2001) *see also Summa v. Hofstra University,,* 708 F.3d at 127–128 (2nd Circ. 2013). Further, Defendants in switching Plaintiff's tour and not formally disciplining him shows the retaliatory nature of their actions. Specifically, if Plaintiff failed to follow the lawful order of Lt. Levine as the Defendants claims, pursuant to the NYPD Patrol Guide he should have been immediately suspended for 30 days and issued a command discipline. This did not occur however as the order to retaliate against Harge was not a lawful order.

Lastly the temporal proximity of adverse action to complaint further Plaintiff was issued a command discipline for allegedly failing to supervise Harge within six (6) weeks of his first formal complaint of discrimination. Plaintiff and several witnesses contest the veracity of these allegations which ultimately led to Plaintiff being improperly disciplined and cost him 10 days' pay. Within days of his complaint Plaintiff's supervisor was explicitly told he could not get what he wanted under any circumstances.. Plaintiff was placed on performance monitoring within six (6) days of his second complaint of retaliation. Lipke testified that a pending investigation is not basis for discipline while the allegations are pending yet Plaintiff was placed on performance monitoring, an adverse action, within days of his protected complaint. See *Olaechea v. City of New York* , 2019 WL 4805846 (S.D.N.Y. September 30, 2019) ("NYPD Performance Monitoring constitutes adverse action"). This discipline was manufactured out of thin air following Plaintiff's engagement in protected activity of refusing to retaliate against Harge and filing protected complaints.

## C. Third Prong: Materially Adverse Employment Action

The term "materially adverse action" refers to one or more actions that change the terms and conditions of an individual's employment. *See, e.g., Joseph v. Leavitt,* 465 F.3d 87, 91 (2d Cir.2006). The action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* Termination satisfies the third prong of the prima facie retaliation test, *i.e.,* that the

employee suffered a materially adverse action. *See, e.g., Lewis v. N.Y.C. Transit Auth.,* 12 F.Supp.3d 418, 439 (E.D.N.Y.2014) (holding that an "adverse employment action" includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation") (citing *Galabya v. N.Y.C. Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)). Plaintiff suffered multiple adverse employment actions as it is defined by the prevailing case law. A decrease in wage or salary or a material loss of benefits is an adverse employment action. *Beyer v. County of Nassau*, 524 F. 3d 160, 163 (2d Cir. 2008). Further, exclusion from positions that "enhance an employee's skill set and may lead to promotional opportunities" is an adverse determination. See *Ewing v. Coca-Cola Bottling Co. of New York*, No. 00 Civ. 7020, 2001 WL 767070, at *6 (S.D.N.Y. June 25 2001), as is a denial of a high-profile assignment. See *Brown v. Snow*, No. 02 Civ.7985, 2003 WL 1907974, at *3 (S.D.N.Y. 2003). There is no exhaustive list of what constitutes an adverse employment action. "Courts have held that ..... denial of benefits, denial of a requested employment accommodation..... and shift assignments that make a normal life difficult for the employee, among other things, constitute adverse employment actions". *Little v. NBC,* 210, F. Supp. 2d 330,384 (S.D.N.Y. 2002). A negative job evaluation may constitute adverse

employment action in certain circumstances such as in this one. See *Treglia v. Town of Manlius,* 313 F. 3d 713, 720 (2d Cir. 2002).

The "adverse employment action" standard in the context of a Title VII retaliation claim "covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." *Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 90 (2d Cir. 2015). Unlike in discrimination cases, in a retaliation case, an adverse action "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id* (quoting *White,* 548 U.S. at 64). Rather, the *sine qua non* of material adversity is whether "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Rivera v. Rochester Genesee Reg'l Transp. Auth.,* 743 F.3d 11, 25 (2d Cir. 2012) (quoting *White v. Dep't of Corr. Servs.,* 814 F. Supp. 2d 374, 388-389 (S.D.N.Y. Sept. 30, 2011). The Defendants' decision to investigate Khazin's conduct and to bring charges against him may also constitute an adverse employment action for retaliation purposes. Some courts in this Circuit "have disagreed as to whether an investigation into disciplinary charges that does not result in any discipline may be sufficient [to] constitute an adverse action in the retaliation context." *Burgos v. City of New York,* No. 18-CV-1150 (JPO), 2019 WL 1299461, at *8 (S.D.N.Y. Mar. 21, 2019) (citing cases). Here, however, the investigation and the charges indisputably led to

Khazin to being disciplined: he was ultimately placed on performance monitoring, denied overtime, tour changes to alter childcare, tour change that cost $4,000 in salary, had his off-duty applications ignored, received unjust discipline, punitive transfer and required to forfeit forty (40) total vacation days over the bogus disciplinary charges, all a deterrence to protected activity. *See Campbell v. NYC. Transit Auth.,* 93 F. Supp. 3d 148, 177 n.30 (E.D.N.Y. 2015); *Monclova v. City of New York,* No. 05-CV-3164, 2008 WL 822117, at *7 (E.D.N.Y. Mar. 26, 2008) (disciplinary charges may constitute an adverse action for purposes of a retaliation claim). Khazin and his witnesses refute the disciplinary charges against him which were done in retaliation for Plaintiff's refusal to unlawfully discriminate and retaliate against Harge.

Further, a reasonable juror could also conclude that Khazin's placement on Level I Monitoring and administrative transfer to the 9th Precinct were materially adverse actions. As the NYPD's performance monitoring manual recognized, placement on Level I Monitoring is a form of discipline. See Exhibit 36 and See *Olaechea at* 2019 WL 4805846. *See White v. Dep't of Corr. Servs.,* 814 F. Supp. 2d 374, 388-389 (S.D.N.Y. Sept. 30, 2011) (finding that a reasonable jury could determine that a notice of discipline was materially adverse where it contributed to the plaintiff paying a fine to settle a disciplinary action).

With respect to Khazin's administrative transfer to the 9th Precinct, he testified that it resulted in a significant loss of overtime wages. Plaintiff earned as much as $70,000 less than similarly situated colleagues in the 9th Precinct following his complaints. Courts have found that the denial of overtime can constitute a materially adverse action. *See Rosario v. N.Y.C. Dep't of Homeless Servs.,* No. 06 Civ. 7197 (PAC) (GWG), 2008 WL 449675, at *6 (S.D.N.Y. Feb. 19, 2008; *see also Grana v. Potter*, 2009 WL 425913, at *7 (E.D.N.Y. Feb. 19, 2009). Plaintiff was further denied the Highway Sergeant position twice in lieu of a less senior and less qualified sergeants. See 56.1 at 418. Plaintiff alleges that the employees who received the benefits over Plaintiff are similarly situated to Plaintiff except they did not engage in protected activity, like Plaintiff. The question of whether Plaintiff is similarly situated to the sergeants he identifies would be improperly determined at this juncture. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." See *Taylor v. Brentwood Union Free Sch. Dist.,* 143 F.3d 679, 684 (2nd Circ. 1998) See also generally *Graham v. Long Island R.R*. 230 F.3d 34(2nd Circ. 2000). Plaintiff suffered numerous adverse employment actions linked to retaliatory animus. Each of the aforementioned are enough to deter an employee from engaging in protected activity.

## D. Causal Connection between Adverse Action and Protected Activity

"Proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000). The Court of Appeals for the Second Circuit has indicated that up to a seven-month gap between protected activity and an adverse employment action is "not prohibitively remote." *Summa v. Hofstra Univ.,* 708 F.3d 115, 128 (2d Cir.2013); *see also Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 110 (2d Cir.2010) ( "[W]e have previously held that five months is not too long to find the causal relationship."). "We have not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009).

Plaintiff has raised several issues of fact that a jury could find a causal connection between protected activity and unlawful relation. Plaintiff was subjected to unwarranted discipline spanning over four years which occurred immediately after he refused to retaliate against Harge. Plaintiff overt refusal to unlawfully target Officer Harge following his discrimination complaint

constitutes protected activity. This question is one for a jury and not for a court to decide. Plaintiff vehemently refutes each and every disciplinary charge issued against him following his engagement in protected activity. Plaintiff was punished within a week of his granting Harge lost time and a day off by a tour change which would deter a person from engaging in protected activity. He was placed on performance monitoring within six (6) days of his retaliation complaint. Plaintiff was placed on performance monitoring outside the normal procedures of the NYPD. Plaintiff was falsely accused and ultimately punished for failing to supervise Harge even though he committed no such infraction within two months of his first formal complaint. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537,552 (2d Cir. 2010) ("[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action."). Further, witnesses from both Highway and the 9th Precinct attest to Plaintiff being treated differently than his colleagues when he engaged in protected activity and attest to his stellar work performance. Further, Plaintiff identifies several similarly situated sergeants in the 9th Precinct that earned $70,000 more than Plaintiff during his time at the 9th Precinct highlighting the effects of the retaliation. Additionally, Plaintiff was yelled at for granting benefits to Harge . Such "evidence of an employer's anger at

its employee for engaging in a protected activity may well constitute direct causal evidence" of retaliation. *Delville v. Firmenich Inc.,* 920 F. Supp. 2d 446, 466 (S.D.N.Y. 2013) (Evidence that the plaintiffs "superiors were angry at him for complaining about age discrimination" was direct evidence of a causal connection between plaintiffs protected activity and defendant's alleged retaliation in violation of Title VII). See also *Olaechea* at 12 ("Being yelled at for engaging in protected activity evidence of pretext.").

This case is remarkably similar to *Villavicencio v. Gure-Perez*, 56 F.Supp. 3d 178, 125 Fair. Empl. Prac. Cas. 416 (E.D.N.Y. 2014 ). In *Villavicencio*, the District Court found that the refusal of a vice principal to deny African American elderly teachers employment benefits in an effort to get rid of these teachers constituted protected activity. *Villavicencio* never formally complained about discrimination. Following *Villavicencio* refusal to target these African American employees, her supervisor began to nitpick and find non-existent problems with her work before ultimately terminating her. The *Villavicencio* supervisor informed her of a theft of service violation which required investigation. This allegation was unsubstantiated but through that investigation it was found other "alleged" violations. Villavicencio was then called a poor supervisor. The Defendants in Villavicencio began to create a paper trail to remove her from the school and ultimately forced her out of the school.

The fact pattern in *Villavicencio* is identical to the instant matter. Plaintiff first engaged in protected activity when he refused to afford benefits to Harge given to every other police officer in Highway. It was well known throughout the Command that Harge filed a complaint of discrimination and Harge specifically told Plaintiff that he filed a complaint of discrimination. The affidavit of Sgt. Fritz Glemaud unequivocally states that Plaintiff "Following Inspector Ameri's suicide, CO John Sanford, prior to his transfer, and acting Lieutenant Sylvester Ge began targeting Sergeant Khazin because he refused to target Police Officer Dana Barge." See Exhibit 4 at 19. Khazin testified that after he was aware of the Harge's discrimination complaint and Defendants concede he refused Levine's orders because he found them to be unlawful retaliation. Plaintiff testified that these orders related to Harge's race and discrimination complaint. Levine explicitly called him a liar and treated him differently. This is similar to the racial animus known in *Villavicencio*. Plaintiff refusal to go along with these discriminatory and retaliatory acts were the catalyst for discipline similarly to *Villavicencio*. Plaintiff testifies that Plaintiff's supervisors, following his refusal to target Harge, began finding minor situations, things that every other supervisor is allowed to do, and they would transform it into unwarranted discipline. The temporal proximity of Plaintiff's adverse actions to protected complaints and witness testimony,

alone, is enough to show a causal connection in the 9th Precinct. This retaliation continued until Plaintiff's constructive discharge.

## E. Employer's Burden: Articulate Non–Retaliatory Reason for Employment Action

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 845 (2d Cir.2013). "After the defendant has articulated a non-retaliatory reason for the employment action, the presumption of retaliation arising from the establishment of the prima facie case drops from the picture." *Id.* "Federal courts do not have a 'roving commission to review business judgments,' and may not 'sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions.' " *Greene v. Brentwood Union Free Sch. Dist.,* 966 F.Supp.2d 131, 156 (E.D.N.Y.2013) (citations omitted). Here the Defendant claim that Plaintiff was a poor performer and a disciplinary issue. The affidavits of Angelique Olaechea and Officer Morton explicitly state otherwise. The Defendants falsely claim that each of the disciplinary measures taken against Plaintiff were warranted whereas, sans leaving his home while on sick report (a 10-day penalty), Plaintiff vehemently refutes each disciplinary charge he was issued. See *Long v. Credit Suisse*, 1995 WL 498783 (S.D.N.Y. 1195) ("Highly material disputes of legitimate business reason

warrant denial of summary judgment"). The affidavits of Plaintiff's co-worker and supervisor state that he performed at or above what is required of a typical sergeant. Olaechea's affidavit states unequivocally that she witnessed officers who complained about discrimination be retaliated against in the 9th Precinct. Lieutenant Olaechea states that Plaintiff was treated in a similar manner following his complaints.

## F. Plaintiff's Renewed Burden: Establish Pretext for Employment Action

The Second Circuit sets forth the standard for alleging pretext in *Kwan v. Andalex Group LLC* 737 F.3d 834 at 845-846(2nd Circ. 2013). The Court in *Kwan* states that "In order to successfully rebut an employer's purported non-discriminatory reason for the employment action, the plaintiff must establish pretext. *Id.* Retaliation must be shown as the "but-for" cause of the adverse action. The standard for establishing pretext is summarized as follows: The Supreme Court recently held that a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a "but-for" cause of the adverse action, and not simply a "substantial" or "motivating" factor in the employer's decision. However, "but-for" causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive. A plaintiff may prove that retaliation was a but- for cause of an adverse employment action by demonstrating weaknesses, implausibility, inconsistencies, or contradictions in

34

the employer's proffered legitimate, nonretaliatory reasons for its action. The determination of whether retaliation was a "but-for" cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." See *Kwan* at 845-846.

In the instant matter the Defendant stories conflict as to Plaintiff's off duty applications, his placement on performance monitoring, his transfer to the day tours following his placement on performance monitoring. Defendants offer no legitimate reason for earning so much less overtime, and disputes exist over specialized positions being given to similarly situated but less qualified sergeants, the placement on performance monitoring, and punitive tour changes. Further, Plaintiff disputes each disciplinary action taken against him and presented multiple witness affidavits supporting the pretext of Defendants claims.

## G. Constructive Discharge

With a Constructive Discharge claim, an employee essentially asserts that the employer, rather than directly discharging an individual, has intentionally created an intolerable work atmosphere that forces that employee to quit involuntarily (*see Whidbee v. Garzarelli Food Specialities, Inc.,* 223 F.3d 62, 73 [2d Cir2000] ). Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt

compelled to resign (*id.*). A "[c]onstructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir.1996); *see also Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983). A court must find a constructive discharge where the employee resigns because an employer causes to exist conditions of such an unpleasant or difficult nature that any reasonable person in the employee's place would do the same. *See Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 161 (2d Cir.1998). Applicable case law makes it clear that an employee is constructively discharged where she resigns in the face of inevitable termination. See *Bragg v. Navistar Int'l Transp. Corp.*, 164 F. 3d 373,377 (7th Circ. 1998)("Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired"). See also *Chertkova*, at 85- 89, and *Lopez v. S.B. Thomas, Inc.,* 831 F. 2d 118 (2d Cir. 1987). To find that an employee's resignation amounted to a constructive discharge, the trier of fact must be satisfied that the working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." See *Lopez at* 1188; *see also Minetos v. City Univ. of N.Y.,* 875 F.Supp 1046, 1052 (S.D.N.Y.1995) (constructive discharge is a question of fact). Plaintiff was forced to travel four to six hours a day to work, was stripped of overtime,

repeatedly had his tours changed to disrupt his schedule, was under significant stress, and facing inevitable termination of employment when he resigned. Whether these actions rise to the level of a constructive discharge is a question of fact for a jury.

## H. Plaintiff's State and City Claims

Under the more lenient NYCHRL and NYSHRL standards, a plaintiff must simply demonstrate by a preponderance of the evidence, that he was "treated less well than other employees because of (his protected characteristic)." *Mihalik v. Credit Agricole Cheuvrex North Am., Inc*., 715 F. 3d 102, 110 (2d Cir. 2013)."The burden at the stage of summary judgment for plaintiff is minimal and de minimis, and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Bowen- Hooks v. City of N.Y.,* 13 F. Supp. 3d 179,221 (E.D.N.Y. 2014) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F. 3d 834, 844 (2d Cir. 2013). Plaintiff respectfully directs the Court to the February 15, 2024 decision of the Court of Appeals decision in *Matter of Clifton Park Apts. LLC v. New York State Div. of Human Rights*, 2024 NY Slip Op 000793 (2024). In that decision the Court highlights the standard for determining an adverse employment action for a retaliation claim which stems from the Case of *Burlington N. & S. F. R. Co. v. White* (548 US 53 [2006]). The Supreme Court concluded that the adverse action

element is satisfied when "a reasonable employee would have found the challenged action materially adverse" in that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (Burlington, 548 US at 68 [internal quotation marks omitted]. In the *Matter of Clifton,* the New York State Court of Appeals found that a letter threatening litigation was sufficient to set forth a retaliation claim. Here Plaintiff pleads that she was subjected to unfounded discipline, exclusion from  precinct  events, denial of promotional opportunities, denied overtime, performance monitoring, and denied transfers to specialized units in retaliation for engagement in protected activity. Plaintiff further pleads explicitly that the retaliatory actions taken against her were done purposefully to dissuade someone from engaging in protected activity. See Amended Complaint at 208, 209.  Plaintiff has sufficiently placed the Defendants on notice of her retaliation claims.

## **CONCLUSION**

For all of the foregoing reasons, Defendants motion for Summary Judgment should have been denied. The District Court's decision should be reverse in its entirety, remanded for trial and whatever further relief this Court deems just and proper.

Dated:   New York, NY       Respectfully submitted,
         August 21, 2024    LAW OFFICE OF JOHN A. SCOLA, PLLC
                        By:_____/ s /_____
                               John Scola, Esq.
                               Attorneys for Plaintiff
                               Valentin Khazin
                               90 Broad Street, Suite 1023
                               New York, New York 10004
                               (917) 423-1445

## <u>PRINTING CERTIFICATION STATEMENT</u>

The foregoing brief was prepared on a computer. A proportionally spaced typeface was used, as follows:

Name of typeface: Times New Roman
Point size: 14
Line spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes and pages containing the table of contents, table of citations, proof of service, Printing certificate statement, cover page certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 9,225 Words.